IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DESMOND MARROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HENRY COUNTY, DAVID ROSE, | ) | |
| MATT DONALDSON, ROBERT | ) | CIVIL ACTION FILE NO. |
| KEITH MCBRAYER, MARK | ) | 1:18-cv-04436-JPB |
| AMERMAN, MICHAEL IRELAND, | ) | |
| CHERI HOBSON-MATTHEWS and | ) | |
| JUNE WOOD, in their Individual and | ) | |
| Official Capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO ROSE AND DONALDSON'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff Desmond Marrow commenced the above-captioned civil action arising out of the use of excessive force during his arrest by Henry County Police Officers David Rose and Matt Donaldson, who unlawfully took Marrow to the ground by slamming his body into the rear tailgate of his pickup truck and then slammed him to the ground, following which Rose used deadly force to choke Marrow until he was unconscious. Critically, this force was used <u>after</u> Marrow

had been arrested and fully restrained in handcuffs, compliant, and not physically resisting or posing any risk of harm.

Simply put, the gratuitous force used by the officers in this case was grossly disproportionate and far exceeds a *de minimis* "push or shove" during a lawful arrest, which force the Eleventh Circuit has consistently and repeatedly held violates the Fourth Amendment. Because every reasonable officer would have known that the challenged use of force was excessive and would violate Marrow's rights, the law was clearly established and qualified immunity is inappropriate. Moreover, because the officers' intentional and unjustified conduct in this case evidences actual malice and an actual intent to cause harm, they are not entitled to official immunity under state law. As such, summary judgment is inappropriate as to the claims against Rose and Donaldson.[1]

## II.   <u>SUMMARY OF MATERIAL FACTS</u>

Rose and Donaldson were dispatched to the Target parking lot at approximately 10:45 a.m. on Saturday, December 2, 2017 in response to an incident on Jonesboro Road wherein two white male occupants in a dark sedan threw a drink on Marrow's vehicle and called him racial slurs.[2] When the officers

---

[1] Plaintiff hereby abandons his remaining claims against the other named defendants.
[2] Marrow Depo. 108:9 to 123:1, 130:23 to 131:3; Donaldson Depo. 62:24 to 64:2.

first arrived at the scene, Marrow was admittedly still upset from the incident and was thus speaking loudly and cursing while explaining to the officers what just occurred.[3] However, as confirmed by Rose's dash camera video, Marrow was not physically aggressive or threatening toward the officers or any other person, and in any event, he calmed down shortly after the officers arrived.[4]

Marrow does not dispute that the officers received initial witness reports accusing him of having a weapon and of being the aggressor in the Jonesboro Road incident. However, the officers eliminated any potential safety concerns which may have arisen. Shortly after arriving at the scene, Rose patted Marrow down and searched him for weapons without resistance or verbal protest; Marrow also voluntarily consented to Donaldson's request to search his vehicle for weapons.[5] No weapons were found on Marrow's person or inside his vehicle.[6] As confirmed by Donaldson and dash cam footage, Marrow was not in any manner threatening and instead fully cooperated with the officers.[7] Thus, the officers allowed Marrow to remain at his vehicle alone, entirely unrestrained and

---

[3] *Id.*

[4] Dash Cam at 01:47 to 25:55; Donaldson Depo. 64:19 to 65:3.

[5] Donaldson Depo. 102:9-16, 126:3-7, 143:1-17, 157:6-7.

[6] Doc. 60-4, *Incident Report*, p. 2 ("I then did a pat down on Marrow to check him for any weapons but did not locate any weapons.").

[7] Donaldson Depo. 56:4-20, 143:10-17; Dash Cam at 03:03.

unhandcuffed, during their entire 25-minute investigation.[8] While unhandcuffed, Marrow did not threaten harm against the officers or any other person at the scene, including witnesses who accused him of misconduct in the Jonesboro Road incident, nor did he attempt to escape or flee.[9]

When discussing Marrow's charges before approaching him for arrest, the officers discussed only three charges — reckless driving, terroristic threats, and aggressive driving — each of which are misdemeanors based solely on the Jonesboro Road incident, not any dangerous conduct exhibited by Marrow at the scene. During this discussion, Donaldson verbally <u>acknowledged that Marrow did not have any weapons</u>.[10] When the officers approached Marrow for arrest, although he asked why he was being arrested, he did not threaten harm, and did not physically resist or attempt to flee.[11] Marrow submitted to the officers' authority, turned around and placed his arms behind his back as ordered, and

---

[8] Dash Cam at 01:47 to 25:55.
[9] *Id.*; Donaldson Depo. 102:9-16.
[10] Dash Cam at 22:05 to 25:10, 24:17 (acknowledging that "nobody has any guns").
[11] Marrow Depo. 167:6-15.

was handcuffed within 15 seconds without incident.[12] Dash camera audio contains no evidence of any physical struggle during handcuffing.[13]

After he was arrested and fully restrained in handcuffs, Marrow continued to comply with commands and walked to the passenger's side, faced his vehicle, and spread his feet as ordered.[14] Donaldson confirmed that at this point, Marrow was "standing there quietly" facing the passenger's side of his vehicle with his back to two officers standing directly behind him.[15] Nevertheless, less than 10 seconds after first ordering Marrow to the passenger's side, Donaldson forcefully kicked Marrow's right foot out to the right,[16] and then attempted to take Marrow to the ground on the passenger's side; Donaldson picked up Marrow's right foot thereby leaving Marrow to balance on only one leg, which leg Rose began kicking.[17] In response, Marrow stated "man, come on with all of that, bruh," and asked a bystander if he was recording what was occurring.[18]

---

[12] Dash Camera at 25:55 (first command to turn around and place hands behind back) to 26:11 (officers locking plaintiff's handcuffs); Marrow Depo. 167:6 to 168:18; Donaldson Depo. 98:19-25.

[13] *Id.*

[14] Dash Cam at 26:27; Donaldson Depo. 96:3-13, 150:18 to 152:1; Marrow Aff. ¶¶ 9-12).

[15] *Id.*

[16] Marrow Aff. ¶¶ 13-15; Dash Cam at 26:27 (command to passenger's side), 26:36 ("come on with all of that, bruh!").

[17] According to Donaldson, he "began to slide [Marrow's right] foot outward" on the passenger's side. Donaldson Depo. 96:20 to 97:16, 160:20 to 162:2, 165:7-14.

[18] Marrow Aff. ¶ 15; Dash Cam at 26:36.

Critically, <u>at no point had either officer ordered Marrow to get on the ground</u>.[19] They nevertheless continued using significant force to get him on the ground. The two officers picked Marrow up and slammed his body into the closed rear tailgate door of his truck, following which Donaldson attempted to separate Marrow's feet while they were hanging off the tailgate, and then picked up Marrow's right leg, swooped it up to his shoulders, and kicked out Marrow's left leg.[20] While doing so, Rose was actively pulling down on Marrow's upper body in the opposite direction, which necessarily caused his body to flip upside down and forced his head and left shoulder to slam into the ground.[21] Approximately thirty (30) seconds elapsed after the officers' first attempt to take Marrow to the ground on the passengers' side before Marrow is heard crying in pain after having his head slammed into the ground near the rear of his vehicle.[22]

Once Marrow was on the ground, he remained securely handcuffed, was visibly in significant pain, was not resisting arrest or attempting to flee, and was surrounded by <u>three</u> officers – Donaldson who kneeled down and positioned

---

[19] Dash Cam at 26:36 to 27:08; Witness Video at 00:00 to 00:15; Marrow Aff. ¶ 16.

[20] Witness Video at 00:04, 00:09; Donaldson Depo. 166:17-25, 167:9-22; Marrow Depo. 176:2 to 179:24.

[21] Witness Video at 00:12; Marrow Depo. 176:2-6, 177:3 to 179:24.

[22] Dash Cam at 26:36 ("come on with all of that, bruh!") to 27:08 (plaintiff moans "oh my god"); Witness Video at 00:15 (plaintiff moans "oh my god" once on the ground at rear of vehicle).

himself in between plaintiff's legs, Rose who bent down behind Marrow's right shoulder, and Sgt. Ingram who was standing directly above plaintiff near his head.[23] While lying on the ground, Marrow lifted his head slightly and made one statement in verbal protest to being slammed on his head.[24] As confirmed by Donaldson, Marrow did not do so aggressively against him or Rose.[25]

In response to Marrow's first and only non-aggressive verbal protest while handcuffed and surrounded by three officers on the ground, Rose immediately gripped the front of Marrow's throat and, using his body weight, pressed down with such significant force that it immediately prevented Marrow from breathing.[26] Despite Marrow's repeated pleas that he could not breathe, Rose continued pressing down on his throat with such significant force that Marrow lost consciousness within 6-8 seconds, at which point Rose released his grip from his throat.[27] Marrow remained unconscious for approximately thirty (30) seconds.[28] After regaining consciousness, Marrow was placed inside a patrol vehicle, at which point Rose bragged to Donaldson, "hell yeah, I choked that motherfucker," and stated he would not include his intentional choking of

---

[23] Witness Video at 00:14; Marrow Depo. 178:3-9, 179:14-2.
[24] Witness Video at 00:30.
[25] Donaldson Depo. 82:1-4.
[26] Witness Video at 00:30; Marrow Depo. 186:12 to 188:2, 187:21 to 188:2.
[27] Witness Video at 00:30 to 00:38; Marrow Depo. 187:21 to 188:2.
[28] Witness Video at 00:38 to End.

Marrow in his report. Following Marrow's arrest, Rose swore out warrants charging Marrow with the three misdemeanor offenses he was initially arrested for, as well as a felony obstruction charge which came with a $10,000 bond.[29]

Following an IA investigation several months later, the County rejected Rose's claim that he accidentally gripped and choked Marrow until he was unconscious as indicated in his incident report, and terminated Rose as a result. Following his termination, Rose was indicted on multiple charges for which he presently awaits trial, including simple battery for "grabbing [Marrow] by the neck, applying pressure and choking him," and for making false a statement in his incident report for "mischaracterizing why and how he grabbed and applied pressure to Desmond Marrow's neck."[30]

## III.   ARGUMENT AND CITATION TO AUTHORITY

### A.   ROSE AND DONALDSON ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR USING EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT.

When evaluating qualified immunity, "[a]s a 'threshold question,' a court must ask, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'"[31]

---

[29] Doc. 60-11, pp. 6-7.

[30] Rose Indictment.

[31] *Artiga v. Garcia*, 316 F. App'x 847, 850 (11th Cir. 2008) (qualified immunity denied to officer who punched suspect and slammed his face into vehicle windshield).

Thus, the court "cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances."[32] "If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine 'whether the right was clearly established.'"[33]

To show that the law was clearly-established, Marrow must identify specific case law from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court which "ha[s] been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."[34] As discussed below, based on several materially-similar cases from this Circuit, every reasonable officer would have known that the force used against Marrow was grossly disproportionate and would violate his rights. Even in the absence of particularized case law, because the gratuitous force in this case "lies so obviously at the very core of what the Fourth Amendment prohibits that

---

[32] *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011).
[33] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).
[34] *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000).

the unlawfulness of the conduct was readily apparent to the official[s], notwithstanding the lack of caselaw,'" qualified immunity is inappropriate.[35]

**1)** <u>**The officers' use of excessive force violated the Fourth Amendment.**</u>

Although "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," under *Graham v. Connor,*[36] "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."[37] Thus, "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be <u>reasonably proportionate</u> to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."[38] Because the relevant inquiry is "whether a reasonable officer would believe that this level of force is necessary in the situation at hand,"[39] it necessarily follows that "an over-reactive,

---

[35] *Id.*

[36] 490 U.S. 386, 396 (1989).

[37] *Lee v. Ferraro,* 284 F.3d 1188, 1197–98 (11th Cir. 2002).

[38] *Id.*

[39] *Id.*

disproportionate action for the situation relative to the response of the apprehended person" violates the Fourth Amendment.[40]

Based on the above-referenced facts, properly viewed in the light most favorable to Marrow, it is "abundantly clear [] that [the officers] used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*."[41] Based on the totality of circumstances known to the officers at the time they restrained Marrow in handcuffs and at every point thereafter, no reasonable officer could have possibly believed that he had a weapon, that he was actively resisting or attempting to flee, or that he posed any risk of harm.

Contrary to defendants' contention that Marrow "committed serious violent felony crimes," as confirmed by the officers' discussions immediately before approaching him for arrest, the <u>only</u> three offenses discussed were reckless driving, aggressive driving, and terroristic threats, each of which constitute misdemeanors.[42] Defendants also inaccurately assert that Marrow "actively resisted" and posed an "immediate safety threat" by relying solely on the following facts: (1) initial witness reports accusing Marrow of dangerous

---

[40] *Stephens v. DeGiovanni*, 852 F.3d 1298, 1317 (11th Cir. 2017).

[41] *Lee*, 284 F.3d at 1198.

[42] Dash Cam at 23:55, 24:35; O.C.G.A. § 40-6-397; O.C.G.A. § 40-6-390; O.C.G.A. § 16-11-37(d)(1). "Nonviolent misdemeanors are 'crime[s] of 'minor severity' for which less force is generally appropriate." *United States v. Brown*, 934 F.3d 1278, 1295 (11th Cir. 2019) (internal citations omitted).

conduct on Jonesboro Road; (2) Donaldson's subjective "fear[]" that Marrow "might be concealing a weapon"; and (3) Marrow's alleged failure to comply with the officers' commands to turn around and put his arms behind his back for arrest and to thereafter refuse to spread his feet on the passenger's side.[43] Defendants' reliance on these facts is woefully misplaced.

First and foremost, regardless of the "subjective motivations" of the officers in using force, "excessive force is judged solely on an objective basis" based on the totality of circumstances known to the officers at the time.[44] Any initial safety concerns that Marrow might have a weapon or might otherwise pose an "immediate safety threat" were definitively eliminated after the officers confirmed that Marrow in fact had no weapons and observed that he was fully cooperative and not threatening any harm. Given the absence of any legitimate concern that Marrow posed any risk of harm or flight, and as clearly evidenced by the officers' decision to allow Marrow to remain unhandcuffed during their entire 25-minute investigation, no reasonable officer could have possibly believed that Marrow posed any risk of harm whatsoever.[45]

---

[43] Doc. 60-2, p. 6.

[44] *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (internal citations omitted) (denying qualified immunity to officers for single punch to plaintiff's stomach while he was handcuffed and posed no risk of harm); *Lee*, 284 F.3d at 1193, n.2.

[45] *Boynton v. City of Tallahassee*, 650 Fed. Appx. 654, 660 (11th Cir. 2016) (qualified

Marrow complied with the officers' orders and submitted to arrest without physical resistance, and was thus arrested and fully restrained in handcuffs within 15 seconds without incident.[46] Marrow then continued complying and walked to the passenger's side, faced his vehicle, and spread his feet as ordered. No reasonable officer could have believed that Marrow posed any risk of harm on the passenger's side – he was fully restrained, handcuffed, compliant, not resisting, had been confirmed to have no weapons, at no point had attempted to flee, and was physically outmatched by the <u>two</u> officers standing behind him.

Nevertheless, and despite never ordering Marrow to get on the ground, both officers attempted to take Marrow to the ground on the passenger's side and, over the course of the next thirty (30) seconds, picked Marrow up, slammed his body into his rear tailgate, and then used force in a manner every reasonable officer would have known would force Marrow's head to slam into the ground. Once Marrow was laying on the ground, no reasonable officer could have believed that he posed any risk of harm – he remained fully secured in handcuffs and was surrounded by three officers, was confirmed to have no weapons and was not resisting arrest, threatening any harm, attempting to flee, or disobeying

---

immunity denied despite initial reports that plaintiff was "combative" because plaintiff calmed down before handcuffing).

[46] *Scott v. Battle,* 688 Fed. Appx. 674, 677 (11th Cir. 2017) (plaintiff was "placed in handcuffs uneventfully, and was being held in the presence of several officers.").

any lawful commands. Despite the absence of any risk of any harm whatsoever, Rose used deadly force and choked Marrow until he was unconscious.

Under Georgia law, deadly force is defined as "force which is intended or likely to cause death or great bodily harm."[47] Because the force used by Rose to choke Marrow prevented him from breathing and indeed, caused him to lose consciousness, it was "likely to cause death or great bodily harm" and thus constitutes deadly force.[48] Even if Marrow's first and only verbal protest and the slight lifting of his head could reasonably be interpreted as authorizing the use of *some* force, no reasonable officer could have possibly believed that it posed an immediate threat of serious bodily injury or death to authorize the use of *deadly* force. "An officer may not use force disproportionate to the amount required to secure a suspect, and, generally, greater force is not reasonable when the officer did not encounter any danger or physical resistance that required him to escalate his use of force to effectuate arrest."[49] Because Rose encountered no danger necessitating the use of escalated, deadly force, Rose's choking of Marrow was grossly disproportionate and violated the Fourth Amendment.

---

[47] O.C.G.A. § 16-3-21(a).

[48] O.C.G.A. § 16-3-21(a); *see also* O.C.G.A. § 17-4-20(b); *Whitley v. State*, 307 Ga. App. 553, 555 (2011) ("[t]he use of hands to choke a victim" constitutes deadly force); *Hall v. State*, 292 Ga. App. 544, 546 (2008) (same).

[49] *Hall v. McGhee*, 762 Fed. Appx. 837, 843 (11th Cir. 2019).

"As [the Eleventh Circuit] ha[s] held on numerous occasions, the gratuitous use of force when a criminal suspect is restrained and not resisting arrest constitutes *excessive* force," not *de minimis* force.[50] There is ample authority from this Circuit clearly establishing that the use of <u>any</u> force, much less significant physical and deadly force, on a fully restrained, handcuffed, compliant, non-resisting suspect like Marrow, violates the Fourth Amendment.

For example, in *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002), the Eleventh Circuit held that <u>every</u> reasonable officer would have known that forcibly grabbing the plaintiff's arm and pepper-spraying her in response to yelling and cursing at the officer while seated in the back of his patrol car, was disproportionate and excessive force. Notably, as a result of the officer's use of excessive force in *Vinyard*, the plaintiff only sustained a bruise on her arm from being forcibly grabbed, and other than experiencing temporary pain and discomfort, had no visible physical injury from being pepper-sprayed. As explained by the court, using pepper spray is "designed to disable a suspect without causing permanent physical injury," and given its limited intrusiveness, "is a very reasonable alternative to escalating a physical struggle with an

---

[50] *Runge v. Snow*, 514 Fed. Appx. 891, 893 (11th Cir. 2013) (emphasis added); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.").

arrestee."[51] Nevertheless, and despite minimal injury, the court held that the officer's use of minimally-intrusive pepper spray against the plaintiff, while she was handcuffed and posing no risk of harm, was not only disproportionate and excessive, but was "so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer had to know he was violating the Constitution even without caselaw on point."[52]

In the instant case, the officers used significant physical force which is far more intrusive than pepper spray and, as a result, Marrow suffered far more significant injury – he lost consciousness, lost a crowned tooth, sustained multiple contusions and abrasions on his left knee, left shoulder, and back, and was bleeding from the left side of his face underneath his eye, knees, shoulder, as well as in the left side of his mouth.[53] Indeed, given the severity of Marrow's injuries, the jail nurse refused to accept him into custody until Marrow received medical treatment at a hospital; Marrow was thereafter evaluated at the hospital and diagnosed with a closed head injury, an acute cervical myofascial strain, lumbar and left shoulder strains, and multiple abrasions.[54] Marrow's injuries

---

[51] *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002).

[52] *Id.* at 1355  (alterations omitted).

[53] Marrow Depo. 192:21 to 194:23, 213:7 to 215:17.

[54] Doc. 60-11, p. 4; Doc. 60-9, pp. 3-6; Doc. 60-4, p. 3; Marrow Depo. 192:21-194:23; Doc. 60-9, *Piedmont Records*, pp. 3, 6.

caused him significant physical pain, as well as significant mental distress, humiliation, and emotional injury as a result of being assaulted in a busy public shopping center parking lot during the Christmas shopping season.[55] These injuries are far from *de minimis*.[56]

Even assuming that Marrow did not suffer serious, permanent injury, and contrary to defendants' contentions otherwise, a plaintiff "who is gratuitously beaten by [officers] does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."[57] This is because the "core judicial inquiry" in an excessive force case is "on the nature of the force applied, rather than the extent of injury inflicted."[58] "To conclude . . . that the absence of some arbitrary quantity of injury requires automatic dismissal of an excessive force claim improperly bypasses [the] core [judicial] inquiry,

---

[55] Marrow Depo. 178:3-9, 211:17 to 212:10, 234:13-25.

[56] *Hasemeier v. Shepard*, 252 F. App'x 282, 284–85 (11th Cir. 2007) (unconsciousness, cuts and bruises, and a broken dental bridge broken are not *de minimis* even if "medical records do not mention these injuries"); *Hudson v. McMillian*, 503 U.S. 1 (1992) (bruises, swelling, loosened teeth, and cracked dental plate are not *de minimis*); *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) ("lacerations, injuries to his teeth and jaw, damage to his left eardrum, and emotional distress" are "significant" and "not *de minimis*"); *Williams v. Rickman*, 759 F. App'x 849, 853 (11th Cir. 2019) (high blood pressure, constant headaches, and paranoia are not *de minimis*).

[57] *Saunders*, 766 F.3d at 1270.

[58] *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) ("Although the extent of injury is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied, it is not solely determinative.").

which is the nature of the force."[59] Simply put, "[t]he principle of *de minimis* force has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat."[60] In fact, "a plaintiff claiming excessive force under the Fourth Amendment can seek nominal damages if he does not have compensable injuries."[61]

For example, in *Slicker*, the plaintiff was kicked in the ribs and beaten in the head by officers while he was fully restrained, handcuffed, and not resisting, which caused the plaintiff to be knocked unconscious and sustain two knots on his head (which injuries were not reflected on medical records).[62] In *Runge v. Snow*, an officer intentionally led the plaintiff's head into a door while he was fully restrained, handcuffed, and not resisting, which caused the plaintiff to sustain a bruise and contusions to the face and chest, in addition to psychological and mental distress. Regardless of the extent of the plaintiffs' injuries in *Slicker* and *Runge*, as was the case in *Vinyard*, because gratuitous force was used <u>after</u> the plaintiffs were fully restrained, handcuffed, and not resisting arrest, the Eleventh Circuit held that the force used by the officers in both cases was

---

[59] *Saunders*, 766 F.3d at 1270 (internal citations and quotation marks omitted).

[60] *Hall*, 762 Fed. Appx. at 843 (internal citations and quotation marks omitted).

[61] *Saunders*, 766 F.3d at 1270 (internal citation omitted).

[62] *Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000) ("From this evidence, a jury could have awarded Slicker compensatory damages for pain and suffering without proof of medical bills, missed work, or lost income.").

*excessive*, not *de minimis* force, and thus violated the Fourth Amendment and clearly established law.[63] The same is true in this case.

### 2) The officers' use of excessive force violated clearly established law.

Because it was clearly established in December 2017 such that every reasonable officer would have known that the gratuitous force used by Rose and Donaldson in this case was unlawful and would violate Marrow's Fourth Amendment rights, qualified immunity is inappropriate. First and foremost, as discussed above, slamming a suspect into the tailgate of his vehicle, forcing his head to slam into the ground, and using deadly force to choke him while he is fully restrained, handcuffed, compliant, not resisting arrest, and posing no risk of harm whatsoever, is grossly disproportionate and "lies so obviously at the very core of what the [Fourth Amendment] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."[64] Qualified immunity is thus inappropriate on this basis alone.

Moreover, the Eleventh Circuit's May 2017 decision in *Scott v. Battle*, 688 Fed. Appx. 674, 677 (11th Cir. 2017), wherein qualified immunity was denied to

---

[63] *Runge v. Snow*, 514 Fed. Appx. 891, 893 (11th Cir. 2013).

[64] *Hall*, 762 Fed. Appx. at 843 (11th Cir. 2019); *Boynton*, 650 Fed. Appx. at 660 (using taser against handcuffed suspect who "tensed" his body was "disproportionate to any threat Boynton posed" and violated Fourth Amendment); *Adams v. Sheriff of Palm Beach Cty., Fla.,* 658 F. App'x 557, 564 (11th Cir. 2016) ("[T]he law was clearly established that the use of deadly force against an unarmed, non-threatening, and non-fleeing individual is unconstitutional.").

an officer who "took [the plaintiff] to the ground" and "slammed" her into the pavement while she was fully restrained, handcuffed, compliant, not resisting arrest, is directly on point and is a "materially similar case [that has] already decided that what the police officer was doing was unlawful."[65] The plaintiff in *Scott* was initially believed to possess a weapon which she reportedly used to commit an aggravated assault, a serious offense. However, dispatch "informed the officers that Scott had discarded her weapon." Although Scott verbally protested being handcuffed, she "was complying with the officers' orders when handcuffed, and after being handcuffed was under the control of the physically stronger [officer],[66] no longer posing any potential danger, surrounded by police, not attempting to flee, and not actively resisting when [the single officer] picked her up off the ground and slammed her onto the pavement."[67]

   As in the instant case, the officer in *Scott* claimed that he was authorized to take Scott to the ground after she was handcuffed because she "actively resisted" by "jerking" her handcuffed arm away from him, and also verbally protested handcuffing. The court rejected these arguments, explaining that "[a] 'minor transgression' after an arrestee is subdued in handcuffs is not a blank check for

---

[65] *Lee*, 284 F.3d at 1193.
[66] Marrow was physically outmatched by the two officers, as evidenced by their ability to pick Marrow up and slam him into his tailgate.
[67] *Scott v. Battle*, 688 Fed. Appx. 674, 678 (11th Cir. 2017).

the use of force."[68] Thus, Scott's "minor transgressions" after she was handcuffed — her "verbal protestations (which, she testified, included no threats or suggestions that she might flee or attempt to harm the officers) and her pained reaction, the 'jerking' of her handcuffed arm, did not warrant such a disproportionate use of force," *i.e.,* slamming Scott to the ground.[69] Moreover, relying on its prior decisions in *Priester*, *Slicker*, and *Lee*, the court held that "<u>no</u> objectively reasonable officer in [the officer's] position could have thought that slamming a physically outmatched, handcuffed, secured suspect—who was surrounded by multiple officers, not resisting arrest, and making no attempt to flee—was a constitutionally permissible use of force."[70]

At best, defendants' contentions as to Marrow's alleged "active resistance" after he was fully restrained in handcuffs amount to nothing more than "minor transgressions" which are materially similar to that at issue in *Scott,* and which the Eleventh Circuit held does not authorize the significant force used by the officers in this case. Based on *Scott*, as well as the three Eleventh Circuit decisions relied on therein, every reasonable officer would have known that slamming a fully restrained, handcuffed, non-resisting and fully compliant suspect into his

---

[68] *Id.* at 678.
[69] *Id.* at 677.
[70] *Id.* at 679 (emphasis added).

vehicle and into the ground in response to any such "minor transgression" constitutes an unlawful and disproportionate use of excessive force. Likewise, based on *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015), every reasonable officer would have known that using escalated deadly force was unlawful under the circumstances. Thus, the law was clearly established and qualified immunity is inappropriate.

Contrary to defendants' contentions otherwise, *Buckley v. Haddock*, 292 F. App'x 791, 792 (11th Cir. 2008) is entirely inapplicable. In *Buckley,* the plaintiff was a "motorist who refused to submit to lawful arrest during a traffic stop" who, after being handcuffed, repeatedly disobeyed the officer's orders to get off the ground and into the patrol vehicle for transport to the jail, and instead remained seated next to "an active highway at night." Thus, *Buckley* was not a case "where a compliant arrestee was abused for no good reason," as there was "a legitimate interest to be advanced by putting Plaintiff in the patrol car," away from the dangers posed on the "active highway."[71] In contrast, Marrow was compliant with the officers' commands at every juncture, both before and after he was handcuffed, and posed no risk of harm. To the extent defendants claim that the officers "faced danger from other vehicles" in the parking lot, said claim

---

[71] *Buckley v. Haddock,* 292 F. App'x 791, 796 (11th Cir. 2008).

is specious and should be disregarded as such. Had any such danger actually existed, a reasonable officer, like the officer in *Buckley*, necessarily would have secured Marrow inside a patrol vehicle to eliminate any such potential danger in the parking lot, rather than order him to remain in the same allegedly dangerous parking lot. There existed no legitimate need to search Marrow for weapons in the parking lot before securing him in the vehicle — he had already been searched and confirmed to have no weapons. Simply put, Marrow, a compliant arrestee, was subjected to significant, gratuitous force for no good reason.[72]

### B. ROSE AND DONALDSON ARE NOT ENTITLED TO OFFICIAL IMMUNITY FOR ASSAULT AND BATTERY UNDER STATE LAW.

"Georgia law authorizes an arresting officer to use no more force than is reasonably necessary under the circumstances to effect the arrest."[73] Thus, if an officer "use[s] more force than is reasonably necessary," he commits an intentional assault and battery.[74] As discussed above, the gratuitous force used against Marrow was grossly disproportionate and far exceeds what was "reasonably necessary" to apprehend and arrest him. Indeed, no force was necessary to apprehend and arrest him. Thus, there exists ample evidence from

---

[72] *Id.* at 792.

[73] *Byrd v. Cavenaugh*, 269 Ga. App. 612, 615 (2004); O.C.G.A. § 17-4-20(b).

[74] *Smith v. Holeman*, 212 Ga. App. 158, 160 (1994); O.C.G.A. § 16-5-20(a); O.C.G.A. § 16-5-23(a).

which "a jury could conclude that [the officers'] conduct toward plaintiff was not justified and that [the officers'] conduct placed plaintiff in fear of an illegal, unauthorized physical contact," thereby committing an assault.[75] "A jury could further conclude that [the officers] carried out the illegal contact and in doing so committed a battery upon plaintiff."[76]

In the context of official immunity, "[a]ctual malice' means an intent to act contrary to law," and the phrase "'actual intent to cause injury' -- for purposes of Georgia's official immunity doctrine -- means 'an actual intent to cause harm to the plaintiff."[77] By committing the intentional torts of assault and battery, the officers acted "intentionally and without justification," and thus "acted solely with the tortious 'actual intent to cause injury'" which is in and of itself sufficient to overcome official immunity.[78]

---

[75] *Gardner v. Rogers*, 224 Ga. App. 165, 169 (1996).

[76] *Id.*

[77] *Croland v. City of Atlanta*, 782 F. App'x 753, 759 (11th Cir. 2019); *DeKalb County v. Bailey*, 319 Ga. App. 278, 283 (2012) (official immunity denied); *Merrow v. Hawkins*, 266 Ga. 390, 391 (1996).

[78] *Gardner*, 224 Ga. App. at 169; *Porter v. Massarelli*, 303 Ga. App. 91, 96 (2010) (denying official immunity for assault and battery); *Hammond v. Gordon Cty.*, 316 F. Supp. 2d 1262, 1294 (N.D. Ga. 2002) (denying official immunity); *DeKalb County v. Bailey*, 319 Ga. App. 278, 283 (2012) (denying official immunity); *Bateast v. Dekalb County*, 258 Ga. App. 131, 132 (2002); *Dyksma v. Pierson*, 763 Fed. Appx. 909 (11th Cir. 2019) (affirming district court's analysis and conclusions in 2018 WL 3430684 (M.D. Ga., 2018)) (denying official immunity for intentionally pressing suspect's neck to the ground "after he should have been able to see that Nicholas was handcuffed, incapacitated, and not resisting").

In addition, actual malice is evidenced by Rose's decision to continue pressing down on Marrow's neck until he was unconscious, despite his repeated pleas that he could not breathe, his subsequent statements bragging to Donaldson about intentionally "chok[ing] that motherfucker," and his attempt to cover-up his intentional conduct by characterizing it as accidental in his incident report. A jury could thus reasonably infer that Rose intentionally choked Marrow with actual malice and actual intent to cause him harm. Despite knowledge that choking a suspect constitutes deadly force prohibited by policy, and despite being in a position to stop Rose from choking and causing harm to Marrow, Donaldson made no effort to stop Rose, nor did he report Rose's conduct or statement to his superiors. Moreover, given Donaldson's undisputed acknowledgement that Marrow had no weapons thereby eliminating any need to search him for any such weapons, a jury could reasonably infer that Donaldson acted with actual malice and with actual intent to cause harm when he nevertheless slammed Marrow into the rear tailgate and into the ground, which Donaldson now asserts he needed to do in order to search Marrow for weapons.

## C. PUNITIVE DAMAGES ARE AUTHORIZED UNDER STATE AND FEDERAL LAW.

Punitive damages are authorized under state law if there is evidence of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want

of care which would raise the presumption of a conscious indifference to consequences."[79] Similarly, punitive damages are authorized under § 1983 if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[80] As discussed above, there exists ample evidence authorizing punitive damages in this case.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff respectfully prays that defendants' motion for summary judgment be denied with regard to the federal excessive force and state law assault and battery claims addressed by defendants therein; and that he have such other and further relief as this Court deems just and proper in the circumstances.

The undersigned, in accord with L.R. 7.1 and 5.1(C) hereby certifies that the type font used herein is 13-Point Book Antigua font.

This 23rd day of December, 2019.

/s/ Dianna J. Lee
Dianna J. Lee
Georgia Bar No. 163391
L. Chris Stewart
Georgia Bar No. 142289

---

[79] *Adams v. Carlisle*, 278 Ga. App. 777, 793 (2006).
[80] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619 (Stewart)
(404) 328-7596 (Lee)
cstewart@stewarttrial.com
dlee@stewarttrial.com

_/s/_ Andrea Boyd
Andrea Boyd
Georgia Bar No. 180962

**THE PRICE BOYD LAW FIRM**
2020 Avalon Parkway #210
McDonough, Georgia 30253
(678) 782-3025

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed a copy of the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO ROSE AND DONALDSON'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which automatically sends a service copy via email notification upon all counsel of record in this case.

This 23rd day of December, 2019.

*/s/* Dianna J. Lee
L. Chris Stewart
Georgia Bar No. 142289
Dianna J. Lee
Georgia Bar No. 163391

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619 (Stewart)
(404) 328-7596 (Lee)
cstewart@stewarttrial.com
dlee@stewarttrial.com