IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DESMOND MARROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HENRY COUNTY, DAVID ROSE, | ) | CIVIL ACTION FILE NO. |
| MATT DONALDSON, ROBERT | ) | 1:18-cv-04436-JPB |
| KEITH MCBRAYER, MARK | ) | |
| AMERMAN, MICHAEL IRELAND, | ) | |
| CHERI HOBSON-MATTHEWS and | ) | |
| JUNE WOOD, in their Individual and | ) | |
| Official Capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Comes now, Plaintiff Desmond Marrow, by and through his undersigned counsel of record and pursuant to Local Rule 56.1(B)(2)(b), hereby files his Statement of Additional Material Facts, showing this Honorable Court as follows:

1.

On December 2, 2017, Plaintiff Desmond Marrow was driving his Chevy Avalanche pick-up truck ("plaintiff's vehicle") and traveling on Jonesboro Road in McDonough, Georgia when the occupants of a black sedan suddenly threw a

cup filled with liquid onto his vehicle and called plaintiff racial slurs. (Exh. A –

Marrow Depo. 108:9 to 123:1).

2.

After the incident on Jonesboro Road, plaintiff pulled into the Target

parking lot. (Exh. A – Marrow Depo. 130:17-22).

3.

When Officers Rose and Donaldson arrived at the Target parking lot in

response to the Jonesboro Road incident, plaintiff was still upset as a result of the

incident on Jonesboro Road, and was initially speaking loudly and cursing while

explaining what happened to the officers. (Exh. A – Marrow Depo. 130:23 to

131:3; Exh. B – Donaldson Depo. 62:24 to 64:2).

4.

Officers Rose and Donaldson thereafter conducted an extensive 25-minute

investigation at the scene to "figure out what was going on." (Exh. B –

Donaldson Depo. 62:18-23).

5.

Shortly following the officers' arrival, plaintiff calmed down as ordered by

the officers. (Exh. B – Donaldson Depo. 64:19 to 65:3) (plaintiff calmed down and

was "calmer than what he was when we first got on scene," and had calmed down before he was handcuffed).

6.

Plaintiff explained to Donaldson that someone had thrown a liquid on his vehicle while he was traveling on Jonesboro Road, and that he was upset as a result. (Exh. B – Donaldson Depo. 63:5-18).

7.

Donaldson confirmed the information explained to him by plaintiff and observed the liquid that was thrown on plaintiff's vehicle. (Exh. B – Donaldson Depo. 63:15 to 64:2 ("I did see liquid on his vehicle, yes. . . . I do recall liquid being thrown, liquid being on the vehicle. Like I mentioned before, I photographed it, actually.").

8.

Shortly following his arrival at the scene, Officer Rose patted plaintiff down to search for weapons and confirmed that he had no weapons. (Exh. B – Donaldson Depo. 53:26 to 54:6 ("Rose did do a pat down."), 102:9-16, 126:3-7, 143:1-17, 157:6-7 ("Officer Rose did do a pat down. I did search his vehicle, yes."); Exh. C – Dash Cam at 03:03; Doc. 60-4, *Incident Report*, p. 2 ("I then did a pat

down on Marrow to check him for any weapons but did not locate any weapons.").

9.

As explained by Donaldson, the purpose of Rose's pat-down search was "[t]o check the outer clothing for weapons to ensure officer safety on scene, and I guess civilian safety on scene too." (Exh. B – Donaldson Depo. 53:26 to 54:21).

10.

Plaintiff also provided his voluntary consent to Officer Donaldson's request to search his vehicle; Donaldson searched plaintiff's vehicle and did not locate any weapons. (Exh. B – Donaldson Depo. 102:9-16, 126:3-7, 143:1-17, 157:6-7 ("Officer Rose did do a pat down. I did search his vehicle, yes.").

11.

Plaintiff did not in any manner verbally protest or physically resist the physical patdown search of his person, voluntarily consented to a search of his vehicle without any protest, and according to Donaldson, was thus "cooperating with the investigation." (Exh. B – Donaldson Depo. 56:4-20 (confirming that plaintiff was "cooperating with the investigation"), 143:10-17; Exh. C – Rose Dash Cam at 03:03).

12.

During the approximately twenty-five (25) minutes that elapsed from the time the first officer arrived to the point at which the officers advised plaintiff that he was under arrest, plaintiff did not at any point threaten physical violence against the officers, the other driver, or any other individual present in the area. (Exh. C – Dash Cam at 01:47 to 25:55).

13.

At no point during the officers' investigation did plaintiff attempt to run away or flee. (Exh. B – Donaldson Depo. 102:9-16; Exh. C – Dash Cam at 01:47 to 25:55).

14.

Given the absence of any evidence that plaintiff posed any threat of physical harm or flight, the officers allowed plaintiff to remain unhandcuffed throughout the course of their 25-minute investigation, during which time plaintiff remained unhandcuffed next to his vehicle where he was allowed to interact with other persons present and to walk to/from his vehicle with no restriction whatsoever.  (Exh. B – Donaldson Depo. 64:16-25 ("I remember him specifically sitting -- he – the Avalanche trucks have, like, a bed cover over them, and I remember him sitting on his bed cover talking on the phone. . . . I

remember him being there, and I would say that's calmer than what he was when we first got on scene."); Exh. C – Dash Cam at 01:47 to 25:55).

15.

Following their investigation, and while plaintiff remained unhandcuffed and alone near the rear of his vehicle, Officers Rose and Donaldson discussed the charges for which they intended to arrest plaintiff. (Exh. C – Dash Cam at 22:05 to 25:10).

16.

The officers discussed their belief that there existed probable cause to arrest plaintiff for only three offenses – aggressive driving, reckless driving, and terroristic threats. (Exh. C – Dash Cam at 23:55 to 24:35).

17.

Before approaching plaintiff for arrest, the officers acknowledged that plaintiff had no weapons. (Exh. C – Dash Cam at 24:17 (before approaching plaintiff for arrest, Donaldson acknowledges that "nobody has any guns").

18.

After discussing their decision to arrest plaintiff, the officers approached plaintiff who at the time was near the rear of his vehicle, and ordered plaintiff to

turn around and to place his hands behind his back for arrest. (Exh. A – Marrow Depo. 167:6 to 168:18; Exh. C – Dash Cam at 25:55).

19.

Plaintiff complied with the officers' orders and turned around and placed his hands behind his back. (Exh. A – Marrow Depo. 167:6 to 168:18).

20.

Plaintiff asked the officers why he was being arrested but did not physically resist, nor did he threaten harm or flight. (Exh. C – Rose Dash Cam at 25:55; Exh. A – Marrow Depo. 167:6-15 ("I didn't fight it or nothing. I just calmly gave him my hands.")).

21.

The two officers securely handcuffed both of plaintiff's arms behind his back within fifteen (15) seconds without incident. (Exh. C – Dash Camera at 25:55 (first command to turn around and place hands behind back) to 26:11 (officers locking plaintiff's handcuffs); Exh. B – Donaldson Depo. 98:19-25).

22.

Plaintiff did not physically resist the officers' efforts to handcuff him. (Exh. B – Donaldson Depo. 98:4-7 (explaining that there was at best "some tensing up

of the muscles" during handcuffing; Exh. A – Marrow Depo. 167:6-15 ("I didn't

fight it or nothing. I just calmly gave him my hands.")).

23.

There exists no evidence of a physical struggle to handcuff plaintiff on

Rose's dash camera audio. (Exh. C – Dash Camera at 25:55 (first command to

turn around and place hands behind back) to 26:11 (officers locking plaintiff's

handcuffs).

24.

While plaintiff was being handcuffed, plaintiff did not make any attempt

to flee, nor did he threaten any harm whatsoever to the officers or any other

person. (Exh. C – Dash Camera at 25:55 (first command to turn around and place

hands behind back) to 26:11 (officers locking plaintiff's handcuffs).

25.

After plaintiff was securely handcuffed at the rear of his vehicle,

Donaldson ordered plaintiff to walk to the passenger's side of his vehicle, face

his vehicle, and to spread his feet. (Exh. C – Dash Cam at 26:27; Exh. B –

Donaldson Depo. 96:3-13; Exh. D – Marrow Aff. ¶ 8).

26.

Plaintiff complied with Donaldson's command and walked to the passenger's side of his vehicle with his feet spread a reasonable distance apart, at which point plaintiff remained securely handcuffed and was directly facing the passenger's side of his vehicle with the two officers standing directly behind him. (Exh. C – Dash Cam at 26:27; Exh. B – Donaldson Depo. 150:18 to 152:1; Exh. D – Marrow Aff. ¶¶ 9-12).

27.

While plaintiff was handcuffed and facing the passenger's side of his vehicle, plaintiff was not resisting arrest or attempting to flee. (Exh. C – Dash Cam at 26:27; Exh. B – Donaldson Deo. 150:25 to 152:1).

28.

As confirmed by Donaldson, plaintiff was on the passenger's side "standing there quietly," "staring forward with his head not moving," and "just kind of looking forward, you know, not – not doing anything." (Exh. C – Dash Cam at 26:27; Exh. B – Donaldson Deo. 150:25 to 152:1).

29.

Both officers were standing directly behind plaintiff while he was handcuffed, complying with the officers' commands, not resisting arrest, and

standing quietly facing the passenger's side of his vehicle with his feet spread apart, with Rose on the left and Donaldson on the right. (Exh. B – Donaldson Depo. 161:2 ("I was on the right side of his body."), 161:20-21 (Donaldson could see Rose with "a simple turn of the head to the left"); Exh. D – Marrow Aff. ¶¶ 9-12).

30.

Officer Donaldson is 6'0, previously played college football, and weighed approximately 230 pounds on the date of the subject incident. (Exh. B – Donaldson Depo. 66:1-3, 141:5 to 142:4).

31.

While plaintiff was handcuffed and standing quietly on the passenger's side of his vehicle with his feet spread a reasonable distance apart, and with two officers standing directly behind him, Donaldson forcefully kicked plaintiff's right leg in an effort to "slide" plaintiff's right foot further outward. (Exh. D – Marrow Aff. ¶¶ 13-14; Exh. B – Donaldson Depo. 160:14-25 ("I began to slide his foot outward."), 165:7-14 ("[W]e were trying to spread his legs.").

32.

Donaldson immediately attempted to take plaintiff to the ground and grabbed plaintiff's right foot from behind him and "lifted it higher in efforts to

make Mr. Marrow lose his balance," which Rose conducted a leg sweep of plaintiff's left leg "to make Mr. Marrow lose his balance." (Exh. B – Donaldson Depo. 96:20 to 97:16 ("[T]here were attempts that were made [to take plaintiff to the ground] on the passenger's side of the vehicle that were unsuccessful. . . . [T]hat's when the struggle took us back to the rear of the truck. And that's when on the video that Mr. Momin had captured is where you see the takedown at the rear of the truck."), 160:20 to 162:2 (Rose attempted to perform a leg sweep "to make Mr. Marrow lose his balance so we can get him to the ground."), 165:7-14 ("I tried to lift his leg up, Officer Rose tried to take him to the ground so we can get the search done.")).

33.

In response to Donaldson's unprovoked use of force on the passenger's side, plaintiff stated "man, come on with all of that, bruh!" and asked a bystander "Are you recording this, bro?" following which a physical struggle can be heard. (Exh. D – Marrow Aff. ¶ 15; Exh. C –Dash Cam at 26:36).

34.

The officers attempted to take plaintiff to the ground on the passenger's side less than 10 seconds after Donaldson first ordered Marrow to the

passenger's side. (Exh. C – Dash Cam at 26:27 (command to passenger's side), 26:36 ("come on with all of that, bruh!").

35.

Approximately thirty (30) seconds elapsed from the point at which Donaldson first attempted to take plaintiff to the ground on the passenger's side, through and until the point at which the officers successfully took plaintiff to the ground at the rear of his vehicle. (Exh. C – Dash Cam at 26:36 ("come on with all of that, bruh!") to 27:08 (plaintiff moans "oh my god"); Exh. E – Witness Video at 00:15 (plaintiff moans "oh my god" once on the ground at rear of vehicle).

36.

At no point had either officer given plaintiff any command to get on the ground. (Exh. C – Dash Cam at 26:36 to 27:08; Exh. E – Witness Video at 00:00 to 00:15; Exh. D – Marrow Aff. ¶ 16).

37.

The following events occurred during the approximately thirty (30) seconds after the officers first attempted to take plaintiff to the ground on the passenger's side:

a.     After Donaldson grabbed and lifted plaintiff's right foot up from behind him on the passenger's side, plaintiff "was balancing on one leg." (Exh. B – Donaldson Depo. 165:15-24).

b.     While plaintiff was "balancing on one leg," Rose attempted to leg sweep plaintiff's left leg by kicking it in a joint effort to take plaintiff to the ground.  (Exh. B – Donaldson Depo. 160:20 to 162:2 (Rose attempted to perform a leg sweep "to make Mr. Marrow lose his balance so we can get him to the ground."), 165:7-24 ("I tried to lift his leg up, Officer Rose tried to take him to the ground so we can get the search done.")).

c.     The officers' joint efforts to take plaintiff to the ground caused them to move from the passenger's side to the parking lot aisle toward the rear of the vehicle, during which time plaintiff's left shoe fell off. (Exh. B – Donaldson Depo. 96:20 to 97:16, 165:15 to 166:3 ("We stumbled to the back of the vehicle."); Exh. A – Marrow Depo. 176:15-23).

d.     Once plaintiff and the two officers were standing near the rear of plaintiff's vehicle, as depicted on the Witness Video, plaintiff remained handcuffed with both hands behind his back; Officer Rose was standing directly behind plaintiff's left side with a firm grip on plaintiff's left arm, and Officer Donaldson was standing directly behind plaintiff's right side

with a firm grip on his right arm; plaintiff did not physically resist either of the two officers, nor did he attempt to run away or flee. (Exh. E – Witness Video at 00:00).

e.       Plaintiff repeatedly advised the officers that he had done nothing wrong, was presently doing nothing wrong, and was not even fighting back. (Exh. E – Witness Video at 00:00).

f.       Officer Rose began walking directly toward the closed rear tailgate of plaintiff's vehicle while pulling the left side of plaintiff's body with him toward the tailgate. (Exh. E – Witness Video at 00:02).

g.       Plaintiff followed Officer Rose and walked in the direction Rose was pulling him with no physical resistance whatsoever, at which point Officer Donaldson was walking behind plaintiff and had both of his hands wrapped firmly around plaintiff's right arm. (Exh. E – Witness Video at 00:02).

h.       With no warning whatsoever, the two officers physically picked plaintiff's body up off the ground and slammed his body over the closed tailgate of his truck, thereby causing plaintiff's ribs to land directly on top of his closed rear tailgate, plaintiff's upper body to lay over the enclosed truck bed, and both of plaintiff's feet to lift off of the ground.

(Exh. E – Witness Video at 00:04; Exh. B – Donaldson Depo. 166:17-25 ("Officer Rose on the left side, I was on the right side, we were able to pick up him and put him to the vehicle – to the tailgate of the vehicle.").

      i.     Immediately after slamming plaintiff's body into the tailgate, Officer Donaldson attempted to spread plaintiff's feet while Officer Rose, who was standing to plaintiff's left, placed his left hand behind plaintiff's neck, wrapped it around to the right side of plaintiff's neck, and while holding onto plaintiff's left arm with his right hand, began pulling plaintiff's body down to the ground. (Exh. E – Witness Video at 00:07).

      j.     Plaintiff was not physically resisting either of the two officers, nor was he attempting to run away or flee. (Exh. E – Witness Video at 00:00 to 00:07).

      k.     While Officer Rose was actively pulling plaintiff toward the ground from plaintiff's left side, Officer Donaldson bent down and picked up plaintiff's right foot, swooped it up to almost shoulder height, and then kicked plaintiff's left leg. (Exh. E – Witness Video at 00:09; Exh. A – Marrow Depo. 176:2 to 179:24; Exh. B – Donaldson Depo. 167:9-22 ("Since Mr. Marrow did not have his feet on the ground, Officer Rose and I were able to get Mr. Marrow to the ground. . . . I had his leg and then I

conducted a leg sweep with my left foot, I believe, and swept his left leg.")).

l.      The officers' combined efforts to take plaintiff to the ground forced plaintiff's body to turn upside down and then forced plaintiff's head and left shoulder to slam into the ground, head first. (Exh. E – Witness Video at 00:12; Exh. A – Marrow Depo. 176:2-6 ("[T]hey just picked me up and slammed me on my head."), 177:3 to 179:24 ("[M]y head hit the ground first, yes, for sure.").

m.      The officers immediately surrounded plaintiff on the ground. (Exh. E – Witness Video at 00:14).

38.

Once on the ground, plaintiff was scared and crying because he did not know what was going on or why the officers were physically attacking him, and at this point, was scared for his life. (Exh. A – Marrow Depo. 178:3-9 ("I was just scared for my life at that point, terrified."), 179:14-24 ("I just felt pain. My head felt like it was kind of on fire, but my adrenalin was going so it kind of subdued some of the pain, but I'm worked up and just I'm crying and scared. So it's like, I didn't know what was going on. I was just scared for my life.").

39.

Once on the ground, plaintiff was moaning and visibly in pain while curled up in a fetal position and laying on the left side of his body with the right side of his body off of the ground. (Exh. E – Witness Video at 00:15).

40.

Three officers surrounded plaintiff on the ground –Officer Donaldson who was on the ground near plaintiff's feet and who was using his bodyweight to secure plaintiff's legs; Officer Rose who was bent down behind plaintiff's right shoulder; and a third officer, Sergeant Ingram, who was standing over plaintiff's head. (Exh. E – Witness Video at 00:15).

41.

Once on the ground, plaintiff did not take any action or make any statement to physically threaten the officers, nor did he attempt to flee. (Exh. E – Witness Video at 00:15).

42.

While plaintiff was laying on the left side of his body with three officers surrounding him, securely handcuffed with his hands behind my back and curled up in the fetal position facing Donaldson, plaintiff slightly lifted his head

up and made one statement that the officers had just "slammed me on my fucking head." (Exh. E – Witness Video at 00:30).

43.

As explained by Donaldson, plaintiff did not lift his head up in an aggressive manner "toward Rose or myself." (Exh. B – Donaldson Depo. 82:1-4).

44.

Immediately after plaintiff made this statement, Officer Rose, who was bent down behind plaintiff's right shoulder, gripped the front of plaintiff's throat and, using his body weight, applied significant pressure to the front of plaintiff's throat, pushing it to the ground. (Exh. E – Witness Video at 00:30).

45.

Officer Rose used his body weight to press down on plaintiff's throat with enough force and pressure that it immediately prevented plaintiff from breathing. (Exh. E – Witness Video at 00:30; Exh. A – Marrow Depo. 187:21 to 188:2).

46.

Given plaintiff's inability to breathe, plaintiff was unable to speak but nevertheless squealed out several times that he could not breathe. (Exh. A – Marrow Depo. 186:12 to 188:2; Exh. E – Witness Video at 00:30 to 00:38).

47.

Rose did not release his grip from plaintiff's throat despite plaintiff's pleas that he could not breathe. (Exh. E – Witness Video at 00:30 to 00:38).

48.

When Officer Rose began choking plaintiff's throat, "it was like an angry response." (Exh. A – Marrow Depo. 186:12-24; Exh. E – Witness Video at 00:30 to 00:38).

49.

Officer Rose "had a devilish look in his eyes" while he was choking plaintiff. (Exh. A – Marrow Depo. 186:12 to 187:1).

50.

Officer Rose applied such significant force and pressure to press down on the front of plaintiff's throat that plaintiff lost consciousness due to his inability to breathe within approximately six to eight seconds. (Exh. E – Witness Video at 00:30 to 00:38; Exh. A – Marrow Depo. 187:21 to 188:2).

51.

Rose did not release his grip from the front of plaintiff's throat until plaintiff was rendered unconscious. (Exh. E – Witness Video at 00:00 to 00:38).

52.

As explained by Donaldson, "a choke is a – a form of deadly force. A true choke could seriously injure or seriously hurt somebody." Thus, "[p]olicy states that – that chokes are not allowed in a restraint form," and are only allowed in a "deadly force situation," for example, "if I'm going to fight for my life and I can't get to my gun or I can't get to anything else, I can do what I need to do to save my life." (Exh. B – Donaldson Depo. 184:6 to 185:6) ("If a deadly force situation is warranted, then a choke is allowed in a deadly force situation.").

53.

Despite plaintiff's repeated pleas that he could breathe, Donaldson did nothing to stop Rose's unauthorized use of deadly force. (Exh. E – Witness Video at 00:00 to 00:38).

54.

Plaintiff remained unconscious for approximately thirty (30) seconds, during which time none of the officers made any effort whatsoever to check plaintiff's pulse to see if he was breathing. (Exh. E – Witness Video at 00:38 to End).

55.

When plaintiff regained consciousness, he was "very nauseous and dizzy" and was in excruciating pain. (Exh. A – Marrow Depo. 191:5-13).

56.

The officers aggressively placed plaintiff inside the patrol vehicle and banged plaintiff's head against the door of the patrol vehicle while doing so. (Exh. A – Marrow Depo. 191:5-13).

57.

While Rose was having a conversation with Donaldson in Donaldson's immediate presence, Rose bragged about choking plaintiff, stating "Hell yeah I choked that motherfucker when you was still wrestling with him." (Doc. 60-1, ¶ 69; Exh. B – Donaldson Depo. 180:24 to 181:11).

58.

Plaintiff retained an expert witness, William Harmening, who offers his expert opinion that the officers' use of force. (Exh. H – Harmening Expert Report).

59.

After being placed inside the patrol vehicle, plaintiff continued experiencing extreme pain and was bleeding from the left side of his face

underneath his eye, knees, shoulder, as well as in the left side of his mouth, and he continued feeling lightheaded, nauseous, and dizzy. (Exh. A – Marrow Depo. 192:21 to 194:23).

60.

The officers did not transport plaintiff to the hospital, and instead transported plaintiff from the scene to the Henry County Detention Center. (Exh. A – Marrow Depo. 192:21 to 194:23).

61.

Upon plaintiff's arrival at the Henry County Detention Center, the nurse on duty observed the cuts, lacerations, and abrasions on the left side of his face and body, and that he was bleeding from his shoulder, face, and head. (Doc. 60-11, *Medical Financial Responsibility & Arrestee Refusal Form,* p. 4; Doc. 60-4, *Incident Report*, p. 3 ("He was refused by the jail staff due [to] his complaints of head, left knee and left shoulder injuries."); Exh. A – Marrow Depo. 192:21 to 194:23).

62.

Due to the severity of plaintiff's injuries, including a "head injury," the jail nurse refused to accept plaintiff into custody at the jail until he received medical treatment for his injuries. (Doc. 60-11, *Medical Financial Responsibility & Arrestee Refusal Form,* p. 4; Doc. 60-4, *Incident Report*, p. 3 ("He was refused by the jail staff

due [to] his complaints of head, left knee and left shoulder injuries."); Exh. A – Marrow Depo. 192:21 to 194:23).

63.

Plaintiff also chipped a tooth on the left side of his mouth which caused bleeding in his mouth and which later fell out completely and which still causes him excruciating pain. (Exh. A – Marrow Depo. 193:7 to 194:2, 213:7 to 215:17 ("It hurts like hell. I endure it. I cry, whatever, just suck it up, but I'm just enduring it.").

64.

Officer Rose transported plaintiff from the detention center to Piedmont Hospital where he received medical evaluation and treatment for his injuries. (Exh. A – Marrow Depo. 193:7 to 194:2, 214:6 to 215:17; Doc. 60-4, *Incident Report*, p. 3 ("I then took Marrow to Piedmont Henry Hospital.").

65.

After being evaluated by medical personnel at Piedmont Hospital, medical staff diagnosed plaintiff with a closed head injury, an acute cervical myofascial strain, lumbar and left shoulder strains, and multiple abrasions on his left knee, left shoulder, and back. (Doc. 60-9, *Piedmont Records*, pp. 3, 6).

66.

Some of the physical injuries plaintiff received on December 2, 2017 still remain today. Plaintiff lost a permanent tooth, has a permanent scar underneath his left eye and left shoulder, and still experiences swelling in the left side of his face. (Exh. A – Marrow Depo. 179:25 to 180:17).

67.

As a result of the officers' unlawful use of force, in addition to his physical injuries, plaintiff suffered significant humiliation, mental distress, and emotional injury as a result of the officers' unlawful use of force, which injuries plaintiff still experiences today. (Exh. A – Marrow Depo. 178:3-9 ("They were pulling my pants down, my – it felt like my – I was embarrassed. I was exposed. You know, I didn't know what was going to pop out."), 211:17 to 212:10 (plaintiff experienced mood swings, depression, anxiety, and flashbacks of the incident), 234:13-25 (plaintiff still experiences mood swings, depression, anxiety, and flashbacks as a result of the incident, and presently experiences significant, uncontrollable anxiety each time he sees a police officer).

68.

Plaintiff also sought medical treatment because he was seeing "dots" which caused him to believe that "something was going on in [his] brain" as a result of getting slammed on his head. (Exh. A – Marrow Depo. 211:15-24).

69.

On or about May 4, 2018, the Henry County Police Department commenced an internal affairs investigation into the force used by the officers during plaintiff's arrest. (Doc. 60-8, p. 3).

70.

During the IA investigation, Rose provided a sworn written statement claiming that he did not intentionally choke plaintiff, and that his hand accidentally moved to the front of Marrow's throat "for a very brief time before [he] realized where [his] hand was and moved it." (Doc. 60-8, p. 53).

71.

During the IA investigation, Rose further confirmed that when he was speaking to Officer Donaldson when he stated "hell yeah, I choked that mother fucker" and advised that he would omit that information from his incident report. (Doc. 60-8, p. 4).

72.

During the IA investigation, Donaldson claimed that plaintiff "donkey-kicked" him on the passenger's side while he "was attempting to search down the right side of his leg" and provided a sworn written statement to this effect, which directly contradicts his deposition testimony wherein he claimed that plaintiff did not spread his feet on the passenger's side as ordered which prevented him from searching plaintiff, and that plaintiff "donkey-kicked" him when Donaldson began "slid[ing]" plaintiff's feet apart in an effort to gain plaintiff's compliance so that he could <u>begin</u> searching him. (Doc. 60-8, pp. 5, 57) ("I was attempting to search Mr. Marrow's right leg when he lifted his leg and kicked me."), *compare with* Exh. B – Donaldson Depo. 96:20 to 97:16, 160:20 to 162:2, 165:7-14 ("[W]e were trying to get a -- a search done. And we weren't able to get the search done standing up because he didn't want to spread his legs.").

73.

During the IA investigation, Donaldson claimed that he did not see Rose choking plaintiff on the ground, and claimed that he "did not see [Rose's] hand near or on the throat" because he was "focused on searching the waistline and pockets of Mr. Marrow" at the time, despite admitting that he heard plaintiff

plead that he could not breathe and further heard "gagging noises" and a "gurgling sound." (Doc. 60-8, pp. 6, 7).

74.

Based on the internal affairs investigation, and after reviewing Rose's statement bragging about intentionally choking plaintiff, the Henry County Police Department concluded that Officer Rose intentionally choked plaintiff thereby using "unnecessary force," and that he further violated the department's conduct policy, and thus terminated him as a result. (Exh. F – Rose Termination, p. 4).

75.

Following his termination, Rose was indicted on multiple charges for which he presently awaits trial, including simple battery based on his "grabbing [Marrow] by the neck, applying pressure and choking him," and for making false a statement in his incident report by "mischaracterizing why and how he grabbed and applied pressure to Desmond Marrow's neck." (Exh. G – Rose Indictment).

The undersigned, in accord with L.R. 7.1 and 5.1(C) hereby certifies that the type font used herein is 13-Point Book Antiqua font.

This 23rd day of December, 2019.

/s/ Dianna J. Lee
Dianna J. Lee
Georgia Bar No. 163391
L. Chris Stewart
Georgia Bar No. 142289

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619 (Stewart)
(404) 328-7596 (Lee)
cstewart@stewarttrial.com
dlee@stewarttrial.com

/s/ Andrea Boyd
Andrea Boyd
Georgia Bar No. 180962

**THE PRICE BOYD LAW FIRM**
2020 Avalon Parkway #210
McDonough, Georgia 30253
(678) 782-3025

## CERTIFICATE OF ELECTRONIC FILING

This is to certify that I have this day filed a copy of the foregoing **PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS** with the Clerk of Court using the CM/ECF system which automatically sends a service copy via email notification upon all counsel of record in this case.

This 23rd day of December, 2019.

*/s/* Dianna J. Lee
L. Chris Stewart
Georgia Bar No. 142289
Dianna J. Lee
Georgia Bar No. 163391

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619
cstewart@stewarttrial.com
dlee@stewarttrial.com