UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DESMOND MARROW,

    Plaintiff,

    v.

HENRY COUNTY, DAVID ROSE,
MATT DONALDSON, ROBERT
KEITH MCBRAYER, MARK
AMERMAN, MICHAEL IRELAND,
CHERI HOBSON-MATTHEWS and
JUNE WOOD, in their individual and
official capacities,

    Defendants.

CIVIL ACTION NO.
1:18-cv-04436-JPB

## ORDER

This matter is before the Court on Defendants David Rose ("Rose") and

Matt Donaldson's ("Donaldson") (collectively the "Officer Defendants") Motion

for Summary Judgment (ECF No. 60) and Defendants Henry County, Robert Keith

McBrayer, Mark Amerman, Michael Ireland, Cheri Hobson-Matthews and June

Wood's (collectively the "County Defendants") Motion for Summary Judgment

(ECF No. 61). Having reviewed and fully considered the papers filed therewith,

the Court finds as follows:

## I.  BACKGROUND

Plaintiff Desmond Marrow ("Marrow") filed a complaint alleging several state law tort claims, a civil conspiracy claim under 42 U.S.C. § 1985 and a Fourth Amendment violation in connection with his arrest by Henry County police officers on December 2, 2017.[1]

On the morning of the incident, a motorist called Henry County 911 to report that he was being chased through a shopping center by a man in a white Chevrolet Avalanche.  Other callers to 911 also reported the chase, and one witness added that the Avalanche was jumping the curb and about to cause accidents.  It is not clear what information was communicated to the responding officers.

---

[1] Key facts are corroborated by video evidence, which the Court has viewed. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (The Court "should . . . view[] the facts in the light depicted by the videotape" rather than rely on a party's version of the facts that is discredited by the record.).  The facts set forth herein are thus described as depicted by the available video recordings or otherwise are presented in the light most favorable to Marrow.  *See Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("At summary judgment, we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances."); *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (stating that in evaluating a summary judgment motion based on qualified immunity, the court is "required to resolve all issues of material fact in favor of the plaintiff").

Officer Rose was the first to arrive, and when he approached the scene, Marrow's pickup truck was parked in a parking spot, and he was talking to the driver of another truck that was stopped in the middle of the aisle.

Rose asked Marrow to explain what happened, and Marrow was agitated and was swearing as he described the incident. Rose interrupted him and asked him to stop cursing, but Marrow responded that he was allowed to curse. Marrow continued to relay the events but still appeared upset. Rose repeated his direction to Marrow to stop cursing and told him to "take it down a notch." A bystander also intervened and asked Marrow to calm down. Marrow responded that he was calm and continued telling the story.

Marrow explained that the occupants of another vehicle threw coffee at his car while he was on the roadway, and he chased them into the parking lot to "talk to them." Rose asked Marrow to take his hands out of his pockets several times before Marrow complied.

At that point, a different bystander walked up and told Rose that Marrow had a gun because he had threatened to shoot the occupants of the other vehicle. Marrow denied he had a gun. Rose thereafter conducted a pat down search of Marrow and did not find a gun.

Officer Donaldson, who had arrived, asked Marrow for consent to search his vehicle, and Marrow agreed. No gun was found.

Donaldson subsequently walked away to interview witnesses, leaving Rose to continue talking to Marrow. Marrow admitted to threatening to shoot the occupants of the vehicle but explained to Rose that his threat was in response to the occupants' threat that they would kill him.

Rose informed Marrow that prior to receiving the call to respond to the scene, he had observed Marrow speeding into the parking lot of the adjacent restaurant but assumed Marrow was late for work. Marrow agreed with Rose that it was "wrong" to chase the vehicle. The conversation between Marrow and Rose waned, and Marrow initiated a cellular telephone call to a family member. He asked the person to come to the shopping center because there was a "situation."

Rose thereafter walked away and left Marrow standing next to his truck. By the time Rose returned, Marrow was quietly sitting on the covered bed of his truck. A witness could be overheard on the dash cam telling one of the officers that Marrow was speeding as he entered the parking lot, ran stop signs and almost hit three or four cars.

Rose again walked away from Marrow to move the police vehicle out of the aisle, instructing Marrow to "stay right there." After Rose moved the car, the dash cam was no longer pointed at Marrow, and only audio of the scene is available.

Rose and Donaldson then conferred on the next steps. They agreed to arrest and charge Marrow with aggressive driving, reckless driving and making terroristic threats, which are all misdemeanor offenses.

At this point, Marrow had been unrestrained—and left unattended at times—for approximately twenty-five minutes. He had also been sitting quietly on the covered bed of his truck for several minutes. At no time while the officers were at the scene did Marrow threaten the officers or any other person. Before the officers executed their plan, Donaldson confirmed to Rose that "nobody ha[d] any guns."

The officers approached Marrow and ordered him to turn around and place his hands behind his back to be handcuffed. The record reflects that Donaldson, a former college football player, is six feet tall and weighed 230 pounds at the time of the incident. Rose is shorter than both Donaldson and Marrow. Marrow is six feet, three inches tall and weighed 210 pounds. He told Rose that he is a former National Football League player.

Marrow testified that upon hearing the officer's instructions, he turned around and complied and asked them why he was being arrested. He further stated

that he "calmly gave [the officer] [his] hands." However, the audio recording reflects that Marrow was upset at the request and protested loudly, including by saying "no!"

In any event, the officers handcuffed Marrow within fifteen seconds of when he was first told to place his hands behind his back. Donaldson testified that Marrow then stood "quietly" facing the passenger's side of his vehicle with the two officers standing behind him.

One of the officers asked Marrow whether he had any weapons on him and instructed him to spread his feet. Marrow apparently did not immediately comply because the officer repeated the instruction several times. Rustling sounds are audible from the recording, and Marrow can be heard protesting and repeatedly proclaiming that he was not doing anything, and he was not "fighting back."

A bystander's video recording starts at this point and shows that both officers and Marrow had moved away from the passenger's side of Marrow's truck and were now in the middle of the aisle. Marrow was still handcuffed, but he had lost a shoe.[2]

---

[2] The next events occur quickly, and the video does not clearly depict what happened. The parties offer different versions of the incident, but on a summary judgment motion, the Court is bound to credit Marrow's version and view the facts in the light most favorable to him.

While holding onto Marrow, both officers led him back toward the rear of his truck.  The officers then slammed Marrow into the back of the truck as they attempted to search him.  A few seconds later, without any warning or instruction to Marrow to get on the ground, they lifted his legs and took him to the ground.

Marrow started crying, exclaiming that the officers had slammed his head into the ground.  He moaned and was visibly in pain while curled up in a fetal position.  Marrow was still handcuffed, and Rose and Donaldson both held onto him.  A third officer stood at Marrow's head observing the incident, and a different bystander walked up and stood next to the third officer.

While on the ground and while Donaldson appeared to be attempting to continue the search, Marrow lifted his head and yelled that the officers had "slammed [him] on [his] f**g head."  Rose then placed his hands on Marrow's throat.  Marrow immediately started squealing in a high-pitched voice that he could not breathe.  Rose's hands, however, remained on Marrow's throat for six to eight seconds until Marrow was rendered unconscious.  Marrow remained unconscious for about thirty seconds.

Marrow was placed in the backseat of the police car after he regained consciousness.  As Marrow sat in the car, Rose and Donaldson stood outside the car discussing the incident.  One of them stated that Marrow was "strong as an ox,"

and Rose admitted that "hell yeah [he] choked that m**r" while Donaldson was "wrestling" with him. Rose stated he would omit the choking incident from his report.

An ambulance responded to the scene, and Marrow requested pain medication but did not request transport to the hospital. However, upon arrival at the Henry County Detention Center, the nurse on duty refused to accept Marrow due to his complaints of head, left knee and shoulder injuries. Marrow was thus transported to Piedmont Henry Hospital.

Marrow was diagnosed with a closed head injury, an acute cervical myofascial strain, lumbar and left shoulder strains and multiple abrasions on his left knee, left shoulder and back. A CT scan did not reveal any abnormalities.

Marrow testified at his deposition that he later sought additional treatment because he was seeing "dots," which caused him to believe he had an injury to his brain. He stated he still suffers symptoms as a result of his injuries, including mood swings, depression and flashbacks, and he has uncontrollable anxiety every time he sees a police officer.

## II.  DISCUSSION

### A.  Legal Standard

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted).  A material fact is any fact that "is a legal element of the claim under the applicable substantive law[,] which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all

factual inferences arising from it in the light most favorable to the nonmoving party." *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist. *Id.* In carrying this burden, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

Also, "[w]hen the nonmovant has testified to events, [the court] do[es] not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) . . . . Instead, when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). As the Eleventh Circuit has summarized, "Federal Rule of Civil Procedure 56 and countless decisions applying it express the modern rule that a case should be put to the jury if there is any genuine issue of material fact, including one created solely by the testimony of a party." *Feliciano*, 707 F.3d at 1247. *See also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012) ("Our case law recognizes that, even in the absence of [corroborative]

evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment.").

However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In sum, if the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B. <u>Analysis</u>

The Officer Defendants contend that this case should be dismissed on the basis of qualified and official immunity and that punitive damages are improper because there is no evidence of the requisite elements. The County Defendants seek dismissal on the grounds of sovereign and official immunity and failure to state a claim. These arguments are addressed in turn below.

### I

In cases brought against government officials acting within the scope of their discretionary authority, the doctrine of qualified immunity protects them from civil

liability unless their conduct violated both the plaintiff's constitutional right and clearly established law.[3]  *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  "The defense of qualified immunity aims to strike a balance between 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *Taylor v. Taylor*, 649 F. App'x 737, 742 (11th Cir. 2016).  The burden is on the defendant to raise the defense, and once the defendant meets his burden, the burden shifts to the plaintiff to show that qualified immunity should not apply.  *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).

Courts in the Eleventh Circuit "conduct a two-step inquiry to decide whether qualified immunity should be granted:  (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right [?]; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, … [was] the right . . . clearly established[?]"  *Shuford v. Conway*, 666 F. App'x 811, 815 (11th Cir. 2016).

---

[3] Marrow does not dispute that the defendants were acting within the scope of their discretionary authority.

"'Both elements must be satisfied for an official to lose qualified immunity.'" *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

### 1. Whether a Constitutional Right Was Violated

"Determining whether the force used in a particular seizure was excessive and therefore unreasonable under the Fourth Amendment requires a court to consider the 'nature and quality' of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake." *Cantu v. City of Dothan, Alabama*, No. 18-15071, 2020 WL 5270645, at *8 (11th Cir. Sept. 3, 2020).[4] As the Supreme Court has explained, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To that end,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal punctuation and citation omitted).

---

[4] This case has been designated for publication, but the reporter citation is not yet available.

For example, in *Taylor*, the Eleventh Circuit found that grabbing the plaintiff without warning, slamming her head first against a patrol car several feet away and causing her injuries, including a spiral fracture in her hand and bruising to her hand, forearm, right upper eyelid and chest, prior to handcuffing her was not excessive. 649 F. App'x at 746. The court reasoned that:

> This Circuit has recognized that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense. We have occasionally described such a threshold level of force as *de minimis*, which is insufficient to support a claim for excessive force. And we have stated that *de minimis* force, even when it is unnecessary, is not unlawful.

*Id*. (internal punctuation and citation omitted).

In *Buckley v. Haddock*, even though the police officer had successfully handcuffed the plaintiff, he repeatedly refused to comply with "minimal" instructions to stand up and walk to the patrol car. 292 F. App'x 791, 794 (11th Cir. 2008). The court found that while the underlying offense of refusing to sign a traffic citation was "relatively minor," the fact that the plaintiff resisted arrest weighed in the officer's favor. *Id*. The court concluded that the use of a taser multiple times to effect compliance, which resulted in sixteen burn marks on the plaintiff's back, was not excessive because it was appropriate to "credit the government with a significant interest in enforcing the law on its own terms, rather

than on terms set by the arrestee" and that "the government has an interest in arrests being completed efficiently and without waste of limited resources." *Id.*

In the excessive force analysis, "[r]easonableness is 'judged from the perspective of the reasonable officer on the scene' without the benefit of hindsight." *Fils*, 647 F.3d at 1287. As such, "[t]he test of reasonableness . . . is not capable of precise definition or mechanical application [and] its proper application requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Factors used to determine whether the force used in a particular case was reasonable include "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016). However, "'[Eleventh Circuit] decisions demonstrate that the point at which a suspect is handcuffed and poses no risk of danger to the officer is often the pivotal point for excessive force claims.'" *Scott v. Battle*, 688 F. App'x 674, 677 (11th Cir. 2017).

Notably, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397. In other words, "[t]he Fourth Amendment inquiry is one of

'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Id*. at 399.

### a. Severity of the Crime

The severity of the crime is relevant to the amount of force that may "reasonably" be used to enforce the law. *See Cantu*, 2020 WL 5270645, at *9. Thus, this factor will weigh against the defendant when significant force is used in connection with a relatively minor crime. For example, in *Cantu*, the court found that the relatively minor offense of failing to provide a driver's license upon demand—a misdemeanor punishable by a fine of $10 to $100 and enforceable by a summons instead of a custodial arrest—weighed against granting immunity to a defendant who used deadly force in effectuating the arrest. *Id*. *See also Fils*, 647 F.3d at 1288 (finding that applying a taser several times in connection with an arrest for disorderly conduct weighed against a grant of qualified immunity); *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (finding that because "*Graham* establishes generally that more force is appropriate for a more serious offense and less force is appropriate for a less serious one[,]" the plaintiff's alleged offense of honking a horn on a busy downtown thoroughfare "strongly weigh[ed] in favor" of denying qualified immunity).

In this case, the record is undisputed that the crimes for which Marrow was arrested were misdemeanors. Even though there were witness reports that Marrow *could* have caused accidents by his actions, there is no evidence that he did cause damage to persons or property. Further, Marrow explained to the officers that his threat that he would shoot the occupants of the vehicle he was chasing was made in response to a threat from the other driver that he would kill Marrow. The officers investigated and expressly dismissed a bystander's allegation that Marrow had a gun. Accordingly, the relatively low severity of the crime weighs against the application of qualified immunity in this case.

### b.      Immediacy of the Threat

In circumstances where there is no threat to the arresting officer or anyone else, courts find that this factor weighs against granting qualified immunity. *See*, *e.g.*, *id*. (denying qualified immunity in part because "there [was] absolutely no evidence indicating that [the plaintiff] posed any threat to the arresting officer or to anyone else"); *Fils*, 647 F.3d at 1289 (finding that qualified immunity was not appropriate in part because the plaintiff did not pose a safety threat to the officer or anyone else where he put his hands in the air and took a step away from the officer when the officer approached with his taser drawn).

In *Cantu*, the parties disputed whether at the time the decedent was shot his hand was placed on the officer's taser simply as a defensive maneuver to prevent further shocks or whether—as the officer contended—he had gained control of the taser. 2020 WL 5270645, at *10. The court reasoned that a jury could reasonably conclude that there was no real threat to the officer because even if the decedent had succeeded in controlling the taser and had thereafter tried to tase one of the officers, the officer who shot him knew that the taser was in drive stun mode (designed to inflict pain and not incapacitate) and there were two other armed officers at the scene. *Id*. As a result, the court concluded that this factor weighed against granting qualified immunity.

Applying the reasoning of these cases here, the Court finds that this factor weighs against the Officer Defendants. The record shows that immediately prior to his arrest, Marrow had been sitting quietly on the bed of his pickup truck, and the officers had previously left him unattended on at least two separate occasions while they investigated the incident. Indeed, Marrow was unrestrained for approximately twenty-five minutes after the officers arrived on the scene, during which time Rose completed a pat down search of him, and, with Marrow's consent, Donaldson searched his car. Marrow even made a call on his cellular

telephone.  The record is devoid of any evidence that Marrow was a threat to the officers or anyone else.

### c.  Resistance or Risk of Flight

As set forth in *Battle*, the cornerstone of the excessive force analysis, is the point where the suspect is restrained and no longer poses a risk of danger to the officer or others.  688 F. App'x at 677.  There, the court rejected the officer's assertion that the plaintiff's jerking motion was "active resistance," which was sufficient to tip this factor in his favor.  *Id*.  The court stated that notwithstanding the fact that this version of the events was disputed, the Eleventh Circuit has previously held that such "a 'minor transgression' after an arrestee is subdued in handcuffs is not a blank check for the use of force; rather, in the event of such a minor transgression, [the] excessive force analysis depends on the totality of the circumstances confronting the officer."  *Id*. at 677-68.  The court ultimately found that even supposing that jerking of the arm could be characterized as resistance, the takedown of the plaintiff was excessive where she was handcuffed and secured and there was no evidence she was attempting to flee or was a threat to the officers on the scene.  *Id*.

In *Fils*, the court noted that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force" and found that the

third factor weighed against granting immunity, where the plaintiff was not resisting arrest or attempting to flee. *See also Lee*, 284 F.3d at 1198 (finding that slamming the defendant's head against the car after she was arrested and secured in handcuffs and posed no threat to the officer or anyone else and was not at risk of flight was "unnecessary and disproportionate"). *Cf. Cantu,* 2020 WL 5270645, at *10 (finding that even though the plaintiff resisted being handcuffed and taken into custody, and he wrestled with the officers, broke free twice and ran around the car as they chased him, "resisting arrest alone is not enough to justify the use of deadly force . . . [e]specially not when the resistance is non-violent").

Here, the application of the third factor is less clear. On one hand, Defendants claim that Marrow was resisting arrest, including by using his "stature and strength" to thwart the officers' efforts to control and search him, and, on the other hand, Marrow asserts he was completely compliant and did not resist arrest. The Court relies on the video evidence (as required by *Scott*) to determine the facts.

The recording of the incident reflects that Marrow was not immediately and fully compliant when Defendants first attempted to place him under arrest. He was, however, handcuffed within fifteen seconds, and he then stood quietly facing the passenger side of his truck. But that is not the end of the story. Marrow started

protesting again when he was asked to spread his legs to allow the officers to conduct a search incident to his arrest. What sounded like a scuffle (occurring off camera) ensued, and the next available video evidence shows that both officers and Marrow had traveled to the middle of the aisle, and Marrow had lost a shoe in the process. Both officers had their hands on Marrow as they walked him back toward his truck. Even though complete video evidence is not available that would allow the Court to see exactly what happened at every turn of the events, what is available makes clear that something less than full compliance occurred. Thus, Marrow's account that he was fully compliant and cooperative is contradicted by the record, and the Court does not adopt it. *See Scott*, 550 U.S. at 380.

Viewing the evidence in the light most favorable to Marrow and recognizing that a jury could reasonably characterize Marrow's seeming resistance as a "minor transgression," the question before the Court then is whether the amount of force used in this case was excessive in light of Marrow's "minor transgression." The Court must also bear in mind the Supreme Court's admonition that courts reasonably allow for the fact that police officers must make split-second decisions in uncertain circumstances and that because the right to make an arrest necessarily carries with it the right to use some degree of physical coercion to effect it, not

every push or shove, even if it may later seem unnecessary, violates the Fourth Amendment. *See Graham*, 490 U.S. at 396-97.

Here, the Officer Defendants break down their use of force into three categories: (i) the slam against the Avalanche; (ii) the takedown; and (iii) the choke.[5] All of these actions were taken while the officers attempted to conduct a search incident to Marrow's arrest.[6]

The Court finds that even viewing the facts in the light most favorable to Marrow, the record reflects that Marrow put up some resistance to this search, and the officers struggled to control him and never had him fully under control while he was upright. Considering the totality of the circumstances, and based on the Supreme Court's and this Circuit's precedent that officers may use some force to effectuate an arrest, even if that force may later seem unnecessary, the Court concludes that the slam and takedown were proportionate, *de minimis* force.

---

[5] Marrow similarly alleged in his Complaint that each of the Officer Defendants' actions "represent[ed] a separate and distinct unconstitutional use of force."

[6] Marrow argues that such a search was unnecessary because the officers had already conducted a pat down search of him, had searched his vehicle and had confirmed that he did not have a gun. However, as the Officer Defendants point out, it is well settled that officers may conduct a more thorough search incident to an arrest, including to search for any evidence of the crime. *See United States v. Robinson*, 414 U.S. 218, 225 (1973) (referring to the "unqualified authority of the arresting authority to search the person of the arrestee").

However, Rose's choking of Marrow was not.  At the time Rose choked Marrow, Marrow was lying on the ground in handcuffs crying, and both Rose and Donaldson had their hands on him.  A third officer was standing at Marrow's head observing the events and apparently did not deem the circumstances serious enough to intervene.  Additionally, a bystander had walked over to stand next to the third officer with no objection from the officers.  It would be objectively unreasonable to conclude that Marrow was a threat to the officers or anyone else or was at risk of fleeing at that time.  His action to lift his head and scream at the officers for slamming his head on the ground could reasonably be construed by a jury as not constituting resistance or as a minor transgression that did not warrant the disproportionate force of choking Marrow until he was rendered unconscious. This could be especially true because his alleged crimes were misdemeanors.

Viewing the facts in the light most favorable to Marrow, the Court finds that Rose's choking of Marrow was not objectively reasonable under the circumstances and therefore constituted excessive force in violation of Marrow's Fourth Amendment rights.

### 2. Whether the Constitutional Right Was Clearly Established

Even where an officer has violated a plaintiff's Fourth Amendment right, the doctrine of qualified immunity will bar recovery unless the plaintiff can show that

the violated right was clearly established at the time of the incident. *See Smith*, 834 F.3d at 1297. This can be shown by providing "'(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Id*. When relying on case law, "[a] close factual fit between the pre-existing case and the present one is essential," and "[g]eneral propositions from earlier decisions will not do." *Cantu*, 2020 WL 5270645, at *11. This is "'especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id*. at 12.

Nonetheless, "[e]ven without a close fit, a plaintiff with a Fourth Amendment claim can clear the clearly established law hurdle and defeat a qualified immunity defense by 'showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official.'" *Id*. This requires a demonstration that "the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was

violating the Constitution even without caselaw on point." *Id*. (internal

punctuation omitted). The key is whether the defendant had "fair warning" at the

time he engaged in the violative conduct that his actions were unconstitutional. *Id*.

It is clearly established in this Circuit that an officer may not use excessive

force against a compliant suspect. In *Hadley v. Gutierrez*, the Eleventh Circuit

confirmed that "a handcuffed, non-resisting defendant's right to be free from

excessive force was clearly established in February 2002." 526 F.3d 1324, 1333

(11th Cir. 2008). The 2002 case referenced by the court is *Lee*, where the officer

was accused of slamming the plaintiff's head into the trunk of a car after she was

handcuffed and subdued. The court explicitly announced that such conduct was

unlawful:

> We are applying the clear and obvious principle that once an arrest
> has been fully secured and any potential danger or risk of flight
> vitiated, a police officer cannot employ the severe and unnecessary
> force allegedly used here. Because [the officer's] actions were so
> plainly unnecessary and disproportionate, no reasonable officer could
> have had a mistaken understanding as to whether the particular
> amount of force was legal in the circumstances.

284 F.3d at 1200 (internal punctuation omitted). Several other opinions rendered

prior to the incident at issue in this case reached a similar conclusion. *See*, *e.g.*,

*Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (finding that

"no particularized preexisting case law was necessary for it to be clearly

25

established that . . . [the officer] . . . violated [the] [p]laintiff's constitutional right to be free from the excessive use of force" when he allowed his dog to attack and bite the plaintiff even though the plaintiff was on the ground and not attempting to flee or resist arrest); *Fils*, 647 F.3d at 1292 (finding that the line between acceptable and unacceptable conduct was not hazy and that no reasonable officer could believe that it was appropriate to shoot his taser probes into a plaintiff who "showed no hostility to the [d]efendants, did not disobey any orders, and did not make any menacing gestures"); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (finding that the district court properly concluded that the officers who repeatedly hit the plaintiff's head on the pavement, kicked him and knocked him unconscious were not entitled to qualified immunity where the plaintiff was laying on the ground in handcuffs and was not resisting or struggling); *Battle*, 688 F. App'x at 679 (finding that "no objectively reasonable officer . . . could have thought that slamming a physically outmatched, handcuffed, secured suspect— who was surrounded by multiple officers, not resisting arrest, and making no attempt to flee—was a constitutionally permissible use of force"). These cases, while not necessarily "materially similar" to the one at bar, also provide "fair warning" and are sufficient to establish that a constitutional right is violated where excessive force is applied to a non-resisting defendant, even in the absence of case

law that is factually on point. *See Fils*, 647 F.3d at 1292 (finding that the cases "need not be 'materially similar' [and that] the precedent need only provide the [d]efendants with 'fair warning'").

Therefore, the Court finds that it was clearly established at the time of the incident that an officer may not use excessive force (*i.e.* choking) on a person who is laying on the ground restrained in handcuffs, who poses no flight risk or risk to the safety of the officers or others and who is surrounded by several officers, including one who was just observing and did not deem it necessary to engage in the process. Indeed, Rose apparently understood this to be the law as he told Donaldson at the scene that he would not include the facts of the choking incident in his report. His report glossed over the incident, and he conveyed only that his hand was "on the front of [Marrow's] neck" and that Marrow "closed his eyes for a second or so."[7]

Because Rose's use of force was excessive and in contravention of law that was clearly established at the time, the Court concludes that he is not entitled to qualified immunity.

---

[7] Neither Donaldson nor the third officer included the choking incident in their reports.

The Officer Defendants' argument that the aforementioned cases are inapplicable because the facts are not identical is unpersuasive. As discussed herein, the cases need not be "materially similar' to be relevant. In addition to the clear principle the cited cases announce, the Court may rely on them because they provided "fair warning" to Rose that his conduct crossed the line between acceptable and excessive use of force. *See id.*

Likewise, the argument that the use of force was *de minimis* because the injuries Marrow sustained were not severe lacks merit. The principle in this Circuit is that "the application of de minimis force, ***without more***, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (emphasis added). There was certainly "more" in this case, including that Rose choked Marrow while he was laying on the ground crying in handcuffs, with two officers holding onto him while the third simply looked on. Indeed, as the Eleventh Circuit stated in *Lee*,

> just as ordinary, reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time, objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm.

284 F.3d at 1200. And Marrow did sustain injuries significant enough that the Henry County Detention Center nurse refused to accept him because he had not received medical treatment.

In sum, the Court concludes that Donaldson is entitled to qualified immunity because he participated only in the slam and takedown of Marrow, which the Court has found was acceptable (in the constitutional sense) viewing the facts in the light most favorable to Marrow and based on precedent allowing the use of some force when a plaintiff is resisting arrest. Under that standard, Rose is not entitled to qualified immunity because choking Marrow constituted an excessive and objectively unreasonable use of force in violation of Marrow's Fourth Amendment rights and violated clearly established law.[8]

## II.

With respect to Marrow's state law claims, the Officer Defendants argue that they are entitled to official immunity and punitive damages are improper because they did not act with malice. They also contend that they cannot be liable for

---

[8] The Court finds that Marrow's argument that Donaldson is liable for failing to stop Rose from choking him is unfounded. Such "liability . . . only arises when the officer is in a position to intervene and fails to do so." *Priester*, 208 F.3d at 924. Here, Rose's hand was on Marrow's throat for only six to eight seconds, and Donaldson was holding onto Marrow's legs at the time. Because Donaldson was not in a position and did not have an opportunity to intervene, he is not liable for Rose's conduct.

assault and battery because they were authorized to make the arrest under Georgia law.

Marrow responds that there is evidence of malice in record that would defeat an official immunity defense, including Rose's statement after the incident. He also contends that the officers are liable for assault and battery because they used more force than was necessary to make the arrest.

"The doctrine of official immunity . . . protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption." *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001). Where there is no evidence in the record of malice or an intent to injure, summary judgment on the basis of official immunity is proper. *Id.* at 346.

In this case, there is no evidence that Donaldson acted with malice or intent to injure Marrow.[9] To the contrary, the Court has found that Donaldson did not use excessive force (in the constitutional sense) in conducting the arrest. Donaldson is therefore entitled to official immunity, and the state law claims against him are dismissed.

_____

[9] Under Georgia law, "a law enforcement officer exercises discretion in responding to an emergency call." *Cameron*, 549 S.E.2d at 346.

Rose, on the other hand, is on the record bragging that "hell yeah [he] choked that m\*\*r." A jury could construe that statement as reflective of malice or a wilful intent to injure. Accordingly, Rose is not entitled to official immunity in this case.

With respect to the claim of assault and battery, Rose would be liable only if his contact with Marrow was illegal or not justified. *See Gardner v. Rogers*, 480 S.E.2d 217, 221 (Ga. Ct. App. 1996). Based on the Court's finding above that Rose was not justified in choking Marrow and that there is evidence in the record that could be construed as malice, there is a genuine dispute as to material facts, and Marrow's claim for assault and battery may proceed to the jury.

For these same reasons, the Court declines to dismiss Marrow's claim for punitive damages. *See Adams v. Carlisle*, 630 S.E.2d 529, 542 (Ga. Ct. App. 2006) ("To authorize the imposition of punitive damages, there must be evidence of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.").

Based on the foregoing analysis, the Court **GRANTS** the Officer Defendants' Motion for Summary Judgment (ECF No. 60) as to Donaldson **only**

and **DENIES** it as to Rose for both the federal and state law claims as they relate to the choking incident.

**III.**

The County Defendants argue in their Motion for Summary Judgment that (i) Marrow's conspiracy claims under 42 U.S.C. § 1985 fail as a matter of law; (ii) sovereign immunity bars the claims against Henry County and the individual County Defendants in their official capacities; (iii) official immunity bars Marrow's state law claims against the individual County Defendants in their individual capacities; (iv) the claim for false statements and concealment fails as a matter of law; and (v) there is no evidence in the record of the intent, wilfulness or recklessness sufficient to support an award of punitive damages.

Marrow did not respond to the motion, so the Court will consider it unopposed. *See* N.D. Ga. Civ. R. 7.1(B) ("Failure to file a response shall indicate that there is no opposition to the motion."). Nevertheless, the Court "cannot base the entry of summary judgment on the mere fact that the motion [is] unopposed, but, rather, must consider the merits of the motion" and "ensure that the motion . . . is supported by evidentiary materials." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004).

With respect to Marrow's § 1985 claim for civil conspiracy, the Court has not seen any evidence that would support the contention that the County Defendants reached an agreement to violate Marrow's rights. Because an agreement is central to a claim of a conspiracy (*see* 42 U.S.C. § 1985 (reflecting that the agreement of "two or more persons" is a necessary element of a claim under the statute)), the Court dismisses the claim.

The Court agrees with the County Defendants that the doctrine of sovereign immunity bars the claims against Henry County and against the individual County Defendants in their official capacities.[10] The doctrine of sovereign immunity protects counties from suits unless such immunity is waived (*see Gilbert v. Richardson*, 452 S.E.2d 476, 479 (Ga. 1994)), and there is no evidence in the record that Henry County waived its sovereign immunity. Consequently, summary judgment is proper on all claims against Henry County and the individual defendants in their official capacities.

The Court also dismisses the claims against the individual County Defendants in their individual capacities on the basis of official immunity. As set forth above, the doctrine of official immunity protects public agents from personal

---

[10] "Suits against 'public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity.'" *Cameron*, 549 S.E.2d at 346.

liability for discretionary actions taken within the scope of their official authority when there is no evidence of wilfulness, malice or corruption. *See Cameron*, 549 S.E.2d at 344. There is no dispute here that the County Defendants' actions were discretionary, and there is no evidence of the requisite "deliberate intention to do wrong" (*Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999)). The Court therefore finds that the official immunity defense applies, and summary judgment is appropriate.

Based on the foregoing analysis, the Court **GRANTS** the County Defendants' Motion for Summary Judgment (ECF No. 61).[11]

**SO ORDERED** this 28th day of September, 2020.

J. P. BOULEE
United States District Judge

---

[11] The Court need not reach the County Defendants' additional arguments for summary judgment as the aforementioned grounds dispose of all claims against them.